764 So.2d 1172 (2000)
James A. YOUNG, et al., Plaintiffs-Appellants,
v.
Billy TURNIPSEED, Defendant-Appellee.
No. 33,602-CA.
Court of Appeal of Louisiana, Second Circuit.
June 21, 2000.
Rehearing Denied August 17, 2000.
*1173 Cook, Yancey, King & Galloway by Jerald R. Harper, Nicole Montagnet Smith, Shreveport, Counsel for Appellants.
Rogers & Hearne by W. Lake Hearne, Shreveport, Counsel For Appellee.
Before BROWN, DREW and CRIGLER (Pro Tempore), JJ.
CRIGLER, Judge Pro Tempore.
The seller, James Young, appeals a judgment rejecting his claims for an accounting and balance due on a timber sale agreement with the purchaser, Billy Turnipseed. The District Court denied the accounting and accepted the expert opinion of its court-appointed forester to find that Turnipseed had compensated Young in accord with the agreement. Finding no manifest error, we affirm.

Factual and procedural background
Young is a real estate appraiser. In 1996 he decided to clear a tract of his land in Caddo Parish near Wallace Lake and develop it as his home place; he intended to clear-cut a small area for a pond and merely "thin" the rest.[1] He retained a forester, Paul Smeltzer, to perform a "cruise" of the tract, admitted as Exhibit D-1. This involved counting trees on one-tenth of the tract and extrapolating the quantity (not value) on the whole. A year later, Young was ready to proceed with the project. He again retained Smeltzer, but this time to perform a "tally," or complete count of every tree to be harvested, together with diameter measurements and height estimates, in order to project the total merchantable timber. All witnesses agreed that a tally is much more accurate than a cruise; Smeltzer's tally was admitted at trial as Ex. J-2. Witnesses testified that this tally, at the time, indicated a harvest valued at $105,000. Young then asked Smeltzer to find a buyer.
Smeltzer contacted Turnipseed, who visited the property and reviewed Smeltzer's tally. Turnipseed offered Young $104,640, but Young turned it down. After a few weeks of negotiations, on June 6, 1997 the parties signed a timber sale agreement which called for Turnipseed to purchase and harvest all marked trees in the thinning area and all trees in the pond area. The contract, admitted at trial as Ex. J-1, fixed prices per thousand board feet ("MBF"), measured by mill scale, for grade pine longs and rough pine logs (the most lucrative portion of the harvest), as well as for chip and pulp. The whole was subject to a minimum price of $90,000. The agreement also stated, in ¶ 3, "Documentation in the form of weigh slips, and *1174 any other documentation provided by the mills will be submitted to the seller."
Turnipseed entered the property and began gathering trees. He testified, and Young confirmed, that Young's contractors had already removed all the trees and most of the stumps from the pond area. Turnipseed's men hauled the logs, depending on their grade, to various local mills. By late June, however, Smeltzer phoned Young with concern that the weigh slips forwarded by Turnipseed reflected much less timber than he expected. Turnipseed insisted that his slips showed he harvested only about $77,000 worth of timber. Nevertheless, he paid the contractual minimum, $90,000, with the note that he "lost $15,728."
Young filed the instant suit in May 1998, seeking an accounting and damages. In June 1998, he filed a motion to appoint a special master, a graduate forestry consultant, to evaluate the actual amount of timber harvested by Turnipseed. The court appointed Gary Patterson. Because by then all the trees had been removed, Patterson performed a "stump count," admitted at trial as Exhibit J-3. In the thinning area, Patterson measured the diameter of each remaining stump, and estimated each tree's height by the diameter and comparison to nearby trees; in the pond area, he roundly estimated the former contents. He assumed that Young's trees were a maximum height of two 16-foot logs, and that the pond area consisted of "average quality pine and hardwood soft timber." He estimated the harvest value was $77,321.
The matter came to bench trial in March 1999. Patterson, the court-appointed forester, admitted that his stump count was not very accurate, and that he would defer to any forester who performed a tally before the trees were removed. Smeltzer, who had performed the tally, criticized Patterson's findings on technical grounds, and testified that Young had been underpaid by at least $15,000. Another of Young's expert foresters, Stephen Muslow, agreed that Young had been underpaid. Smeltzer and Muslow both testified that the documentation provided to Young was incomplete, riddled with errors and insufficient to meet industry standards.
Turnipseed disputed the quality of Young's timber, describing it as "average, at best," adding that Smeltzer's 1996 cruise confirmed this; in fact, had he seen the cruise before he bought the timber, he would not have offered $104,000 or guaranteed $90,000 for the harvest. He further testified that most of the trees in the pond area had been damaged when Young's track hoe operators knocked them down and dragged them into rubbish heaps. He admitted that some weigh slips were erroneous, but claimed that they did not affect the final count. On cross examination Smeltzer admitted that at one point he may have said the pond area contained only about 30% grade logs; based on this estimate, Young's other expert, Muslow, calculated the harvest would be worth about $74,000.
The District Court rendered a written opinion finding first that the contract was a timber sale, not an agency relationship between the parties, and thus Young was not entitled to any more of an accounting than the weigh slips or scale tickets than Turnipseed received from the mills. The court then expressly accepted the opinion of the court-appointed expert, Patterson, as to the volume and quality of the timber cut. The court concluded that Young had been compensated in accord with the contract and rejected all claims.
Young has appealed, advancing two assignments of error.

Discussion: Enforcement of contract
By his first assignment Young urges the District Court erred in failing to enforce the terms of the contract, specifically the duty to provide adequate documentation under ¶ 3 of the agreement. Young contends that even though Turnipseed forwarded weigh slips or mill tickets, this did not discharge his burden *1175 of proving the volume of timber removed from Young's land.
Contracts have the effect of law between the parties and must be performed in good faith. La. C.C. art. 1983. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. C.C. art. 2046. While the determination that a contract is ambiguous is legal in nature, the District Court's factual finding of compliance or substantial compliance with a contract is subject to the manifest error rule. Noel v. Discus Oil Corp., 30,561 (La.App. 2 Cir. 5/13/98), 714 So.2d 105, 138 Oil & Gas Rep. 571.
The timber sale agreement obligates Turnipseed to furnish Young with "documentation in the form of weigh slips, and any other documentation provided by the mills." This provision is not apparently ambiguous. The finding that Turnipseed complied is subject to manifest error analysis.
Turnipseed testified that he gave Young "scale tickets" for every load of timber, except for three tickets from Hunt Lumber that were misplaced; for those three loads, he testified that he provided weigh tickets only.[2] Young admitted this was true. R.pp. 240-241. One of Young's experts, Muslow, testified that scale tickets may be used to verify the volume of timber hauled, but are reliable only if the information thereon is accurate. Turnipseed admitted that several tickets contained some erroneous information, but their weight readings were accurate. Turnipseed's business partner, Bradley Sepulvado, who actually delivered several of the loads, testified that drivers or mill employees may have entered the wrong name, date or parish on the tickets, but he was never shortchanged on any haul. On this evidence, the District Court was entitled to find that Turnipseed's documentation to complied with ¶ 3 of the agreement.
Young's petition requested an accounting; at trial he developed testimony that Turnipseed and Sepulvado kept daily and weekly tally sheets showing the true volume harvested from the tract. On cross examination, however, Young admitted he was not entitled to Turnipseed's personal records, and the timber sale agreement contains no provisions for additional accounting from the purchaser.[3] On this record, the District Court was not plainly wrong to find no agency or other duty on Turnipseed's part to furnish more documentation than that already provided. This assignment of error lacks merit.

Value of the harvest
By his second assignment Young urges there is no record evidence to support the District Court's rejection of his claims. In support he reiterates that Turnipseed breached the contract by failing to provide sufficient documentation. He further urges that Patterson's report was incomplete, based on erroneous assumptions, and not reliable; thus the court was plainly wrong to adopt it instead of the more comprehensive opinion of the plaintiff's expert, Smeltzer. He argues that the total value of the harvest was $125,000, so he is entitled to judgment of $35,000.
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, *1176 training or education, may testify thereto in the form of an opinion or otherwise. La. C.E. art. 702. Ultimately, the weight given to expert testimony depends upon the facts on which it is based as well as the professional qualifications and experience of the expert. Meany v. Meany, 94-0251 (La.7/5/94), 639 So.2d 229. However, when expert witnesses differ in their testimony, it is the responsibility of the trier of fact to decide which is the most credible. Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305. When documents or objective evidence so contradict the witness's story, or the story itself is so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it, the court of appeal may find manifest error or clear wrongness even in a finding purportedly based on a credibility determination. Id.; Stobart v. State, 617 So.2d 880 (La.1993). Credibility determinations are subject to the strictest deference and the manifest error/clearly wrong standard demands great deference to the trier of fact's findings. Rosell v. ESCO, 549 So.2d 840 (La.1989). The ultimate question is not whether the fact finder's conclusions are right or wrong, but reasonable on the record presented. Stobart v. State, supra.
At trial, most of the evidence was disputed. Young's experts, Smeltzer and Muslow, focused on deficiencies in Patterson's report. For instance, they discussed the "mill scale," which reflects the actual volume of trees delivered and is called for in the contract, and criticized Patterson for using the "Doyle scale," a kind of estimate which, according to Patterson and Turnipseed, is used by all the local mills. Muslow testified that the mill scale would yield a higher volume; Young testified that the mill scale rate for grade pine logs was $380 per MBF, but $450 per MBF on the Doyle scale. Turnipseed testified that since all local mills use the Doyle scale, he considered it the "mill scale." He conceded that normally the mill scale is larger than the Doyle scale, but this time it was smaller.
Young testified that he had mostly old and high quality pine on his property, especially in the pond area; Smeltzer testified that the average height was three logs. Based on Smeltzer's tally, he and Muslow calculated that the tract should have yielded nearly 3,000 logs; however, the documentation provided by Turnipseed shows that only 900 or so were delivered to mills for grade and rough. Young admitted that work crews may have damaged some trees when their track hoes were clearing the pond area; however, even making generous allowance for damaged and defective trees that went for chip and pulp, Young's experts estimated that about 1,500 logs were missing. Turnipseed, however, testified that Young's timber was "average, at best." Smeltzer's 1996 cruise described the pond area as "primarily a mixture of average quality pine and hardwood saw-timber." Patterson assumed the composition in the pond area was the same as in the thinning area. Turnipseed testified that the track hoes badly damaged the trees in the pond area by knocking them down and dragging them into rubbish heaps. This would have reduced many of the bigger grade pine trees to low-value chip and pulp.
Perhaps the biggest point of dispute was the size of the pond area. Patterson paced the pond area, estimated it was 12 acres, and rendered his opinion based on that size. Smeltzer's 1996 cruise, however, fixed the pond area at 36 acres. Young testified that based on a survey, the pond was 21 acres; the survey was not introduced in evidence.
Admittedly, the genuine facts are hard to discern. Young argues that the discrepancies in the size of the pond, the quality of the wood and the type of scale prove that a certain amount of timber was unaccounted for. Young's own evidence, however, is not free from ambiguity. Notably, there is the discrepancy between Smeltzer's two reports; while a tally is more accurate, the 1997 report, prepared in anticipation of a sale, shows at least a *1177 50% larger harvest than his 1996 cruise, which was for informational purposes. Smeltzer also admitted on cross examination that at one point he may have said the pond area contained only 30% grade logs; using this factor, Muslow estimated the harvest was worth about $74,000. This is strikingly similar to the estimate rendered by Patterson, the court-appointed expert. Finally, Turnipseed and Sepulvado, as well as their wives, steadily maintained that all timber was accounted for.
Based on this contentious evidence, we are unable to say the District Court abused its discretion in accepting Patterson's report and holding that Young was not entitled to additional compensation. Meany v. Meany, supra. The physical and documentary evidence is too unsettled to contradict the factual finding that the harvest yielded less than $90,000. Theriot v. Lasseigne, supra. We perceive no manifest error. This assignment lacks merit.

Conclusion
For the reasons expressed, the judgment is affirmed. Costs are assessed to the appellant, James A. Young.
AFFIRMED.

APPLICATION FOR REHEARING
BROWN, WILLIAMS CARAWAY, DREW, and CRIGLER, JJ.
Rehearing denied.
NOTES
[1] The record does not document the size of the tract; Young's testimony, Smeltzer's 1996 cruise and Patterson's 1998 report all give conflicting figures.
[2] The terminology is not always consistent. The tickets from Hunt Lumber Co. (grade pine saw logs) show net weight but each is accompanied by a tally sheet counting stems by length and diameter, and giving net board feet. The tickets from Louisiana-Pacific (rough pine saw logs) are labeled "Weight and Scale Tickets," and show net weight, tally and total board feet on the same slip. The tickets from International Paper (pine pulpwood) are labeled "Scale Tickets," and show only the net weight of the load.
[3] The agreement describes the buyer as an independent contractor over whom the seller "shall not have, and will not exercise, any kind of control." Ex. J-1, ¶ 11.