988 So.2d 882 (2008)
HAMEL'S FARM, L.L.C., Plaintiff-Appellant,
v.
Ike MUSLOW, M.D. and Berte A. Muslow, Defendants-Appellees.
No. 43,475-CA.
Court of Appeal of Louisiana, Second Circuit.
August 13, 2008.
Rehearing Denied September 11, 2008.
*884 Blanchard, Walker, O'Quin & Roberts by M. Thomas Arceneaux, Scott R. Wolf, Shreveport, for Appellant.
Tutt, Stroud & McKay by A.M. Stroud, III, Pugh, Pugh & Pugh by Robert G. Pugh, Jr., Shreveport, for Appellees.
Before WILLIAMS, STEWART and LOLLEY, JJ.
STEWART, J.
At issue is the ownership of 12.62 acres of land described as Lots D, E, F and G of Dixie Gardens Subdivision No. 2 (hereafter "Dixie Gardens"). Except for a part of Lot G, all the acreage is covered by a lake. Hamel's Farm, L.L.C., filed a declaratory action seeking to be adjudged owner of the entirety of the property. Ike Muslow, M.D., and Bertie Muslow (hereafter "the Muslows"), were named as defendants. The trial court declared Hamel's Farm to be the owner of only the part of Lot G outside the lake bed. Hamel's Farm now appeals the denial of its claim of ownership as to the remainder of the property, and the Muslows appeal that part of the judgment *885 declaring Hamel's Farm the owner of part of Lot G.
Because we find that Hamel's Farm failed to prove ownership through acquisitive prescription of the part of Lot G that is dry land, we reverse the trial court's judgment insofar as it declares Hamel's Farm owner of that part of the property and affirm the denial of Hamel's Farm's claims as to the rest of the property.

FACTS
Hamel's Farm filed a petition for declaratory judgment to be named owner of the disputed 12.62 acres after the property was excluded from its sale of a 176.09 acre tract for residential development. The title by which Hamel's Farm claimed ownership of the property was clouded by the Muslows' title to 12.62 acres, which had been platted as Lots D, E, F, and G of Dixie Gardens in 1928 by the Muslows' ancestors-in-title. Most of the 12.62 acres underlie a lake, which is believed to cover up to 125 acres of land, and which formed over the property in the late 1930s after the Shreve Island Cutoff set the Red River on its present day course. A small part of Lot G is on dry land across the lake from where the Muslows live.
In its petition, Hamel's Farm alleged ownership by title and by acquisitive prescription. Hamel's Farm's title claim is based on a 1941 deed by which its ancestor-in-title, Alex Knight, purchased a 2.56 acre tract and an additional 291 acres from National Gasoline Company of Louisiana, Inc. In 1957, Knight sold to Charles M. Hamel over 800 acres, which included the property obtained from National Gasoline in 1941. Through partitions and conveyances among members of the Hamel family, the property in dispute came to be owned by Hamel's Farm.
The Muslows, whose home is located on land by the lake, purchased the property at issue in 1976. They wanted to protect the integrity of their home by preventing future construction of a subdivision in their backyard should the lake ever become dry. The Muslows claim ownership of the property by record title traced back to the sovereign; alternatively, they claim ownership through acquisitive prescription.
How the lake formed is at issue. Hamel's Farm asserts that the inundation of the property was caused by a gradual southwesterly movement of the Red River. This movement ate away the land and the ownership of the Muslows' ancestors-in-title through the process of accretion and dereliction. The Muslows claim the lake was precipitated by a flood or avulsion that occurred in May 1930. Both parties supported their theories with expert testimony as well as numerous exhibits, including maps and surveys of the area.
In written reasons for judgment, the trial court rejected Hamel's Farm's theory that the disputed property resulted from accretion and dereliction and accepted the Muslows' theory that the disputed property was inundated by flooding in May of 1930. Based on this finding, the trial court concluded that Hamel's Farm did not have valid record title to the disputed property. Moreover, the trial court specifically noted "that the property descriptions and attached maps in [Hamel's Farm's] title chain leave an uncomfortable measure of ambiguity of property boundaries as compared to [the Muslows'] title chain."
The trial court then turned to the claims of acquisitive prescription. First, the trial court found it unnecessary to address the Muslows' claim of acquisitive prescription in light of their having valid record title to the property. With regard to the property comprising the lake bottom, the trial court concluded that Hamel's Farm failed to prove possession for either the 10 or 30 *886 year prescriptive period. The trial court found that the lots comprised "only a fraction of the entire lake bed," and that while the parties did various activities on the lake, there was no showing of adverse possession by Hamel's Farm. According to the trial court, the testimony showed there had been doubts on the part of the Hamel family about their ownership of the property. As to the part of Lot G located on dry land, the trial court found in favor of Hamel's Farm on the basis of possession in excess of 30 years and the fact that the Muslows did not know that any part of Lot G extended onto dry land.
Judgment was rendered declaring Hamel's Farm owner of that part of Lot G that does not constitute the lake bed but denying relief as to the remainder of the property. Hamel's Farm and the Muslows have both appealed the trial court's judgment.

ISSUES ON APPEAL
Hamel's Farm has raised the following two issues for review:
1. Whether the trial court erred in relying on an opinion by an expert witness when there is no evidence in the record to support the assumed facts relied upon by the expert.
2. Whether the trial court erred as a matter of law by failing to find possession by Hamel's Farm or its predecessors to the full extent of the 1957 deed from Alex Knight to Charles Hamel and, therefore, by not declaring Hamel's Farm the owner of the water bottom in question to the full extent of the description in the 1957 deed.
The Muslows have also appealed. Their issue for review states:
1. Whether the trial court erred as a matter of law in finding that Hamel's Farm exercised "continuous, uninterrupted, peaceable, public, and [un]equivocal" possession of that portion of Lot G that is dry land because there was no testimony that Hamel's Farm actually possessed the property for the requisite 30-year period.

DISCUSSION

Declaratory Action for Ownership of Immovable Property
This matter was filed by Hamel's Farm as a petition for declaratory judgment. Such actions are governed by La. C.C.P. art. 3654:
When the issue of ownership of immovable property or of a real right therein is presented in an action for a declaratory judgment ..., the court shall render judgment in favor of the party:
(1) Who would be entitled to the possession of the immovable property or real right therein in a possessory action, unless the adverse party proves that he has acquired ownership from a pervious owner or by acquisitive prescription; or
(2) Who proves better title to the immovable property or real right therein, when neither party would be entitled to the possession of the immovable property or real right therein in a possessory action.
Both parties allege ownership by title and, alternatively, through acquisitive prescription. However, the Muslows have a chain of title deriving from the sovereign, whereas Hamel's Farm purports to have a title beginning in 1941, after the Muslows' chain of title was allegedly broken by the effect of the Red River's movement.
In Liner v. Terrebonne Parish School Bd., 519 So.2d 777 (La.App. 1st Cir.1987), writ denied, 521 So.2d 1173 (La.1988), cert. denied, 488 U.S. 827, 109 S.Ct. 79, 102 L.Ed.2d 55 (1988), the school board prevailed *887 as the defendant in a declaratory judgment action by proving its title derived from the sovereign and the location of the property. The school board held title to all land within Section 16 and proved that the land in dispute lay in Section 16, rather than Section 9 as claimed by plaintiffs. Because Section 16 was state land, the plaintiffs could not establish ownership through acquisitive prescription.
Like the defendant in Liner, supra, the Muslows' title traces to the sovereign, and the location of the disputed lots is not at issue. Therefore, the Muslows prevail on the basis of their title unless there is merit to Hamel's Farm's claim that the title chain was broken or if Hamel's Farm can prove ownership by acquisitive prescription.

Title to the Property
Hamel's Farm disputes the trial court's finding that the Muslows have a valid record title and that it does not. An appellate court may not reverse the factual findings of the trial court unless a review of the record in its entirety reveals that the trial court's factual findings are manifestly erroneous or clearly wrong. Stobart v. State through DOTD, 617 So.2d 880 (La.1993). The issue to be resolved is not whether the trial court was right or wrong, but whether its conclusion was reasonable. Id. Reasonable evaluations and inferences of fact are not to be disturbed on appeal where conflict exists in the testimony. Id. When there are two permissible views of the evidence, the trial court's choice between them cannot be manifestly erroneous or clearly wrong. Id.
Hamel's Farm argues that the movement of the Red River caused the Muslows' ancestors-in-title to lose title and its own ancestors-in-title to gain it. Hamel's Farm's theory, as expressed in its brief, is that "the Red River, beginning perhaps in 1908 or earlier and continuing until the mid-1930s, migrated by accretion and dereliction until it came to the existing body of water, and that, after the 1930s Shreve Island Cutoff, the existing body of water ceased to be a part of the bed of the Red River." Hamel's Farm posits that the process of accretion and dereliction ate away Lots D, E, F, and G of Dixie Gardens, causing the Muslows' title to have been lost by operation of either La. Civ. C. art. 499 or 504.
We begin our review with the testimony and evidence about the river's movement and its effect on the property at issue. In 1941, National Gasoline sold by quitclaim deed to Alex Knight 291 acres located in Sections 10, 14, 15, and 16.[1] The deed described the conveyance as including "all of that part of Nicholson Place or Rainbow Plantation, lying and situated West of the center line of "Shreve Island Cut Off" and West of that part of Red River flowing immediately South of said Shreve Island Cut Off and containing in all approximately 291 acres of land, with all improvements thereon." The deed did not mention any land that had been platted and recorded as Dixie Gardens.
In 1957, Alex Knight conveyed by quitclaim deed all the land he had purchased from National Gasoline to Charles M. Hamel. The deed included "all accretions to the land by reliction and dereliction, as well as all additions thereto resulting from the changing water courses or the opening of new channels." Again, the deed did not mention any land that had been platted and recorded as Dixie Gardens.
*888 Charles Milton Hamel is the current manager of Hamel's Farm and the son of the Charles M. Hamel named as purchaser in the 1957 deed. He testified that his father purchased property north of the lake from Alex Knight in 1957. The purchase included 800 acres that are located along the Red River in Shreveport from East 70th Street to Shreveport-Barksdale Highway. The 176 acres, excluding the disputed property, that Hamel's Farm sold for residential development are the southernmost part of the 800-acre tract. Hamel testified that he and the Muslows are neighbors. Both have homes by the lake, which covers about 125 acres. Thus, the 12.62 acres in dispute are a small part of the lake bed. Hamel admitted there had been questions about the title to the disputed area but that he had not previously been willing to spend money to find out who actually owned the lake.
Hamel's Farm's expert in surveying, Travis Sturdivant, testified that the southern boundary of the property sold by Knight in 1957 is the southern boundary of the disputed 12.62 acres. He based his opinion on a "call" in the 1957 deed identified as the center line of the Red River at the date of the "Shreve Island Cut Off." Sturdivant explained that he coordinated the call with a map of an old boundary agreement between Caddo and Bossier Parishes. According to Sturdivant, the boundary agreement defined the center line of the old Red River with metes and bounds courses that match the southern boundary of the disputed acreage. To support his opinion, Sturdivant referred to a Caddo Levee District map entitled "Red River Continuous Survey 1931-32" which documented the changing bank line through the 1930s and 1940s. The map shows that the bank line in 1936 cut through Lot B, fell below Lots C, D, E, F and most of G of Dixie Gardens. Sturdivant said that the bank lines referred to the high bank of the river, and he believed that the lots were "most probably" covered by water in 1936. Sturdivant explained that the river eroded the bank away causing the water to flow over the disputed acreage.
Sturdivant's opinion that the disputed property was the southern boundary of the property sold by National Gasoline to Knight was based on establishing the center line of the Red River at the time of the Shreve Island Cutoff. Sturdivant overlaid a survey made by him of the acreage sold by Hamel's Farm, including the lots in dispute, with a 1937 survey by George Dutton, an engineer. The 1937 survey depicted the cutoff and the water line of the old river channel, which had not yet disconnected from the new channel of the river. According to Sturdivant, the overlay of the 1937 survey on his survey showed that the center line of the Red River cut through Lots D, E, F, and G in 1937.
Both the trial judge and counsel for the Muslows questioned whether Sturdivant could locate the actual bed of the old channel of the Red River. Sturdivant explained that the bed would be the area below the low water mark of the river, but he could not identify the actual low water mark of the river and thus could not identify the exact location of the river bed. Moreover, Sturdivant admitted that Dutton's 1937 survey primarily dealt with an area in Bossier Parish referred to as Rainbow Plantation. The Shreve Island Cutoff and the old channel of the Red River were drawn as an approximation without exact measurements. Also on cross, Sturdivant testified that the 1937 survey had been done after the Shreve Island Cutoff was made and would not necessarily depict the exact location of the Red River's channel as it existed at the time of the cutoff. (We note that the 1941 and 1957 deeds in Hamel's *889 Farm's chain of title describe the property sold with reference to the "center line of old Red River as it existed at the time of Shreve Island Cutoff.")
Dr. Gary Joiner, an expert in geography, history and cartography, testified for the Muslows. Dr. Joiner disagreed with Sturdivant's conclusion that the lake at issue had been a part of the Red River's channel. Rather, he concluded that the present-day lake was formed from three sources: the remnants of an ancient lake on Shreve Island as shown on surveys done in the 1830s, the oldest navigable channels of the Red River on the east, and an avulsive event that occurred in May 1930.
Dr. Joiner explained that Dixie Gardens had been platted on dry land in 1928. After the creation of the subdivision, an avulsion occurred during the third week of May 1930.[2] This was a huge rain event that caused flooding along the Red River in Caddo and Bossier Parishes. The newspapers reported levee damage at the Great Bend, which Joiner identified as the area above where the disputed property is located. According to Joiner, the May 1930 avulsion was a predatory avulsion that reinflated or recreated old channels of the river. The effects of the avulsion along with seasonal differences in the river's water level caused the river's west bank to more rapidly extend in a southwesterly direction. Dr. Joiner explained that the outer wall of an avulsion is like the edge of a soup bowl with the amount of soup in the bowl determining the bank line. Presumably, as the water level of the river increased, the bank line extended outward. Dr. Joiner believed that this "avulsive" process caused the lots at issue, which had a lower elevation than other lots in the subdivision, to eventually become inundated with water. When the Shreve Island Cutoff was made around 1935, it shortened the river. The lake then formed as a result of the three sources mentioned above. Joiner did not believe that the lake covering the disputed property was part of the river's channel, except for perhaps the easternmost area of the lake.
On cross-examination, Dr. Joiner explained that at the time of his deposition he had not yet found and reviewed the newspaper articles from May 1930. At his deposition, he had described the river's movement as a "steady onward march but acts like an avulsion." Joiner admitted that none of the newspaper reports said that the levee had been breached in May 1930 or that water had topped the levee. He also testified that he had not examined records from the Caddo Levee Board.
Dr. Joiner discredited the 1937 Dutton survey used by Sturdivant to demonstrate that the disputed property was once part of the river bed. He explained that Dutton's survey was of Rainbow Plantation in Bossier and was not a survey of the old river channel. Rather, the Shreve Island Cutoff and the old river channel were sketched in for positional awareness. Most importantly, nothing on the 1937 survey indicated the width of the old river channel. Dr. Joiner also believed that *890 Plaintiff's Exhibit MMM, a survey of the acreage sold by Hamel's Farm for development overlaid with Dutton's 1937 survey, failed to establish the center line of the old river channel for the reason that it was based on a sketch lacking any reference points to establish an accurate representation of the river's location.
Joiner maintained that an avulsive event in May 1930 resulted in changes that flooded the area and that the 1935 cut acted as a manmade avulsive event that "perpetuated" the lake. He also noted that while the easternmost part of the lake covering the property in dispute was likely once part of the bed of the river, no one had actually examined the bed of the lake to determine the extent to which it was once part of the river's bed. Finally, he observed that accretion played no part in forming Lots D, E, F, and G and was not an issue in this matter.
When experts differ in their testimony, the trier of fact decides which is more credible. Young v. Turnipseed, 33,602 (La.App. 2nd Cir.6/21/00), 764 So.2d 1172, citing Theriot v. Lasseigne, 93-2661 (La.7/5/94), 640 So.2d 1305. The weight to be given to an expert's testimony depends on the facts on which it is based, as well as the expert's professional qualifications and experience. Young, supra. Moreover, the trial court has great discretion to accept or reject expert opinion. Johnson v. English, 34,322 (La.App. 2d Cir.12/20/00), 779 So.2d 876.
Two views of what caused the river's southwesterly movement and its effect on the disputed property, namely, whether the disputed property was once part of the river bed, were presented. The trial court rejected Sturdivant's opinion and accepted Joiner's. We find no error in this credibility determination. The implication of the trial court's rejection of Sturdivant's theory is that the disputed property was not part of the river bed. Regardless of whether the property was affected by an avulsion or a gradual southwesterly movement of the river's west bank, the record does not support Hamel's Farm's claim that the southern boundary of the property described in the 1941 and 1957 deeds is the southern boundary of the property in dispute or that the property was part of the river's bed.
Sturdivant's opinion was that the lake was once part of the river bed and that the center line of the river at the time of the Shreve Island Cutoff is the southern boundary of the property in dispute. However, the trial court could have discredited this theory as it was largely based on a survey from 1937 that does not appear to depict the river channel with an accuracy or exactitude that would allow a reasonable determination of what area was covered by the bed of the river or of the location of the center line of the river as it existed at the time of the Shreve Island Cutoff. Hamel's Farm failed to prove that the boundary described in the 1941 and 1957 deeds included the property at issue. We agree with the trial court's conclusion that Hamel's Farm's chain of title, specifically the property descriptions in the 1941 and 1957 deeds, leave "an uncomfortable measure of ambiguity."[3]
*891 Contrary to Hamel's Farm's claim that Dr. Joiner's testimony was based on assumed facts that are not supported by the record, articles from the Shreveport Times and the Shreveport Journal for May 22, 1930 through May 27, 1930, reported widespread flooding along the Red River area and efforts to put up protective levees due to breaks in the levee around Shreve Island and caving banks in the Dixie Gardens area. While there was no specific report of flooding at Dixie Gardens, the articles do show there was damage to the river's west bank. Evidence establishes that the May 1930 flooding began a process of caving that continued through the mid-1930s when a new levee in Dixie Gardens was constructed and the Shreve Island Cutoff was made to direct the flow of the Red River.
Plaintiff's Exhibit K, a letter from the Board of State Engineers written in October 1935 to the Caddo Levee District and the Bossier Levee District, explains what was happening along the bank of the Red River in Dixie Gardens during the early 1930s. The letter refers to plans for construction of set-back levees at certain bends in the river, one of which is above the property at issue, to remedy the problem of caving banks. The letter states, "Levees built within the past three years at Dixie Gardens have caved in the river...." In conjunction with the construction of new levees, the federal government offered to construct pilot channels, presumably referring to the Shreve Island Cutoff, to guide the flow of the river. Plaintiff's Exhibits C and J are both maps by the Board of State Engineers showing the proposed new levee for Dixie Gardens (Exhibit C) and the area of land used or damaged in constructing the levee (Exhibit J). These show that the new levee was constructed below the property in dispute. The Shreve Island Cutoff is located northeast of Dixie Gardens across the channel of the Red River as it existed then.
The record establishes that the disputed property was damaged when the new Dixie Gardens Levee was constructed around 1935. Maps in evidence show the west bank line of the river encroaching onto the property at issue in 1935 and falling below the property in 1936. The record also shows that the Muslows' ancestors-in-title were compensated by the Caddo Levee Board for the damage to their property occasioned by construction of the levee in 1935.
In effect at that time was Section 6 of Article 16 of the Constitution of 1921, which provided:
Lands and improvements thereon hereafter actually used or destroyed for levees or levee drainage purposes shall be paid for at a price not to exceed the assessed value for the preceding year; provided, this shall not apply to batture, nor to property control of which is vested in the State or any subdivision thereof for the purpose of commerce.
Land actually used or destroyed for levee purposes was considered to be appropriated, and the landowner could demand payment. Mayer v. Board of Com'rs for Caddo Levee Dist., 177 La. 1119, 150 So. 295 (1933). Landowners who received compensation for land destroyed as a result of levee construction did not lose title. As explained in 2 La. Civ. L. Treatise, Property § 88 (4th ed.), "The ownership of the lands used or destroyed for levee purposes remained in the riparian landowner, because the lands were not `expropriated' but merely `appropriated' for levee construction and the payment was an indemnity for the public use."
Our thorough review of the record shows that the river's southwesterly movement was increased by the effect of the May 1930 rain event as described by Dr. *892 Joiner. The river's west bank began a process of caving until the construction of the Dixie Garden Levee below the property at issue in 1935 and the Shreve Island Cutoff, which set the Red River on its present course. The construction of the Dixie Garden Levee damaged the property at issue by causing the bank line of the river to extend over the property covering it with water from the river. This effectively destroyed the property at issue, and the Muslows' ancestors-in-title were compensated for the loss by the Caddo Levee Board.[4] Nothing in the record supports the claim that the Muslows' chain of title was broken.
Additionally, the record does not support the conclusion that the property in dispute was once part of the river's bed. The bank of a navigable river or stream is the land lying between the ordinary low and the ordinary high stage of the water; when there is a levee in proximity to the water, established according to law, the levee shall form the bank. La. Civ. C. art. 456; Edmiston v. Wood, 566 So.2d 673 (La.App. 2d Cir.1990). The bank of a river is a private thing subject to public use. La. Civ. C. art. 456. The bank belongs to the riparian owner. 2 La. Civ. L. Treatise, Property § 62 (4th ed.). The river bed is the land covered by water at the river's ordinary low stage. La. Civ. C. art. 456, Comment (d).
Sturdivant testified that a surveyor would interpret the bank line depicted on a survey or map to represent the high bank of the river. Nothing in the record contradicts this testimony. Therefore, it is reasonable to assume that the bank lines shown extending over the disputed property after 1935 and 1936 represent the high bank line of the river. While evidence shows that the disputed property was within the river's bank, the record does not support a finding that the disputed property was below the ordinary low stage of the river such that it would be part of the river's bed. The bank of the river would have belonged to the riparian landowner on the west bank, who was not shown to be Hamel's Farm's ancestors-in-title. Rather, the record supports a finding that title and ownership of the disputed property remained in the hands of the Muslows' ancestors-in-title.
We also find no merit to the claim by Hamel's Farm that its ancestors-in-title acquired ownership of the property through the operation of La. Civ. C. art. 499 or 504.
La. Civ. C. art. 499 explains that alluvion is accretion that forms successively and imperceptibly on the bank of a river. The alluvion belongs to the owner of the bank. Dereliction is formed when water recedes imperceptibly from the bank of a river, and it too belongs to the owner of land situated at the edge of the bank left dry. Id. Both alluvion and dereliction formed along the bank of a river belong to the riparian landowners, who own land adjacent to the river. Walker Lands, Inc. v. East Carroll Parish Police Jury, 38,376 (La.App. 2d Cir.4/14/04), 871 So.2d 1258, writ. denied, XXXX-XXXX (La.6/3/05), 903 *893 So.2d 442, recon. not considered, XXXX-XXXX (La.11/28/05), 916 So.2d 127.
The trial court rejected the claim that Hamel's Farm's ancestors-in-title acquired the property as accretion or dereliction to what was conveyed in either the 1941 or 1957 deed. Rather, the trial court accepted Dr. Joiner's testimony that the property at issue was not formed, flooded, or drained by accretion or dereliction. We cannot say that this factual conclusion is manifestly erroneous. There is no testimony or evidence establishing that the property in dispute was formed by accretion or dereliction as the Red River began flowing through the Shreve Island Cutoff. Even if the disputed property could be considered to have resulted from these processes, there is simply no showing or basis in the record for finding that Hamel's Farms ancestors-in-title would have gained ownership.
Though Hamel's Farm cited Walker Lands, Inc., supra, in support of this argument, we find that case to be inapposite. Walker Lands involved a dispute between the state and a private person over ownership of dry land and a lake. The evidence proved that when the Mississippi River shifted course, the dry land was formed through accretion and the lake formed from water left behind in a swale in the land. Riparian landowners acquired ownership of the property. Neither the facts nor the factual conclusions in Walker Lands is persuasive under the particular facts of this case where lots in an existing subdivision were inundated by the river when a new levee was constructed and a manmade cut redirected the river leaving a lake to form over the lots as explained by Dr. Joiner's testimony.
We also find no merit to Hamel's Farm's contention that it acquired ownership through the operation of La. Civ. C. art. 504. When a river changes course by abandoning its bed and opening a new one, the owners of the land on which the new bed is located shall take as indemnification the abandoned bed, each in proportion to the quantity of land lost. La. Civ. C. art. 504; State v. Bourdon, 535 So.2d 1091 (La.App. 2d Cir.1988), writ denied, 536 So.2d 1223 (La.1989). Although the Red River changed course when it began flowing through the Shreve Island Cutoff, Hamel's Farm has not proven what land it lost due to the change in course of the river or that the disputed property constitutes the abandoned bed of the river to which it would be entitled.
For these reasons, we find that Hamel's Farm failed to prove that it holds record title to the disputed property. Neither the 1941 nor the 1957 deed in Hamel's Farm's chain describes the disputed property. The record does not support the claim that the land attached to Hamel's Farm's property as accretion or dereliction created by the movement of the Red River. Rather, the evidence clearly proves that the Muslows have valid record title to the 12.62 acres in dispute.

Acquisitive Prescription
Both Hamel's Farm and the Muslows appeal the trial court's judgment declaring Hamel's Farm to be the owner by acquisitive prescription of 30 years of that part of Lot G that is dry. Hamel's Farm argues that the trial court erred in not declaring it owner of the entirety of the disputed property. The Muslows argue that Hamel's Farm did not prove ownership of any part of the disputed property by acquisitive prescription.
The burden of proof is on the party seeking to establish title to land through acquisitive prescription. Greengrove Missionary Baptist Church v. Cox, 42,418 (La.App. 2d Cir.9/19/07), 966 So.2d 707, writ denied, 07-2064 (La. 12/14/07), *894 970 So.2d 537. Ownership may be acquired through acquisitive prescription of 10 or 30 years.
To establish ownership by acquisitive prescription of 10 years, one must prove good faith possession for 10 years under just title of a thing susceptible of acquisition by prescription. La. Civ. C. art. 3475. A just title is a juridical act that is sufficient to transfer ownership or another real right. La. Civ. C. art. 3483. It must be written, valid in form, and filed for registry in the conveyance records of the parish where the property is situated. Id. A just title "must sufficiently describe the property so as to transfer its ownership." Ryan v. Lee, 38,352, p. 4 (La.App. 2d Cir.4/14/04), 870 So.2d 1137, 1140, writ denied, XXXX-XXXX (La.10/1/04), 883 So.2d 991. This means the property must be identifiable from the description in the deed or from other evidence in the public records. Id.
As previously addressed, we have concluded that the deeds upon which Hamel's Farm bases its ownership do not describe or identify the property at issue nor is the property included in the deed as an addition to the land described therein from accretion or dereliction. The disputed property cannot be identified from the description in the deeds or from the maps attached to the 1957 deed. Because Hamel's Farm lacks just title, it cannot prove it acquired the disputed property by acquisitive prescription of 10 years.
We also note that the trial court found a lack of good faith on the part of the purchaser, Charles M. Hamel, and his son and manager of Hamel's Farm, Charles Milton Hamel. To acquire property by prescription of 10 years, possession must commence in good faith. La. Civ. C. art. 3482. A possessor in good faith reasonably believes, in light of objective considerations, that he is the owner of the thing he possesses. La. Civ. C. art. 3480. The testimony showed that the Hamels had doubts about the extent of their ownership. Charles Milton Hamel testified that his father had purchased the property north of the lake from Alex Knight. We note that the majority of the property at issue is covered by the lake, and only part of Lot G is outside the lake. He also admitted there were "title questions" about ownership of the disputed property and explained that he had not been willing before this matter to spend the money to determine the true owner. This testimony supports the conclusion that Hamel's Farm did not reasonably believe by objective considerations that it owned the property.
For these reasons, we find no error in the trial court's denial of Hamel's Farm claim of ownership based on acquisitive prescription of 10 years.
Ownership of immovable property may be acquired by prescription of 30 years without the need of a just title or good faith. La. Civ. C. art. 3486; Greengrove, supra. However, in the absence of a title, possession extends only to that area which has actually been possessed. La. Civ. C. art. 3487. This requires proof of inch by inch possession or possession within enclosures; it is also referred to as pedis possessio, foot possession. Ryan v. Lee, supra. Possession is determined according to the nature of the property. Id. Moreover, possession must be continuous, uninterrupted, peaceable, public and unequivocal. La. Civ. C. art. 3476. Possession of part of an immovable by virtue of a title constitutes constructive possession within the limits of the title. La. Civ. C. art. 3426. Without a title, one possesses only to the extent of what is actually possessed. Id.
As mentioned, Charles Milton Hamel testified that his father bought the property north of the lake from Alex Knight in 1957. The property covered *895 about 800 acres, and Hamel's Farm eventually came to own the 176-acre tract, which was alleged to include the disputed 12.62 acres. Hamel testified as to various uses of the property since 1957. These included recreational activities, such as hunting, trapping, hayrides, and picnics. Some of the land was leased for farming and cattle operations for which fences were built extending into the lake. Water and sewer lines were placed on the property, soil testing was conducted, and parts were rezoned.
With regard to use of the lake, Hamel testified that he put a weir in the lake to control the water level. It was located on the east end of the lake where Hamel resides. Professional trappers were brought in to rid the lake of beaver and nutria that caused damage to a driving range added to the property. Recreational uses of the lake included duck and teal hunting, waterskiing, and fishing. Bream and bass were put in the lake, as were grass carp to control aquatic weeds. Wood ducks and geese were also put around the lake.
Hamel testified that he saw the Muslow family on the lake a dozen times a year and that the Muslows had a pier on the lake from which they fished. Nothing in Hamel's testimony indicated that the Muslows were ever prevented from using the lake. On cross, he also testified that none of the fences built on Hamel property would have blocked access to the disputed property.
The Muslows both testified about their usage of the property from the time of the sale in 1976. These were primarily recreational activities, such as fishing, boating, and enjoying the view. Dr. Muslow collected cow manure for gardening from land on the other side of the lake, and he took his children there for adventures when they were young. Part of the cost of stocking the lake with grass carp was paid by Dr. Muslow, and he was consulted about lowering the lake depth for a waterskiing tournament. The record also shows that Dr. Muslow paid property taxes on the disputed lots. Dr. Muslow admitted that he did not know that any part of the property he purchased in 1976 was on dry land. He was aware that the land across the lake was used for cattle operations, but he did not see any farming, fencing, or other activities in that area.
Because Hamel's Farm lacks title to the property, it had to prove actual possession, such as inch by inch or within enclosures, to acquire ownership by prescription of 30 years. Our close review of the testimony convinces us that Hamel's Farm failed to prove actual possession of any of the disputed 12.62 acres for the requisite 30-year period. Hamel's testimony about activities on the property and lake was not limited to the disputed 12.62 acres. Rather, his testimony appeared to pertain to the entirety of the property, including the 125 acre lake.
The trial court correctly observed that Hamel and the Muslows have been cordial neighbors who both reside on the lake. Both have used the lake, as have others. The evidence does not establish that Hamel's Farm exercised actual possession of that part of the disputed acreage within the lake or possession in a manner that was continuous, uninterrupted, peaceable, public and unequivocal. We find no error in the trial court's denial of Hamel's Farm's claim to the disputed acreage covered by the lake.
The trial court did find that Hamel's Farm exercised continuous, uninterrupted, peaceable, public and unequivocal possession of that part of Lot G that is on dry land based on Hamel's testimony regarding various agricultural activities, as well as hunting, fishing, and trapping that took place on the property. As we have pointed out, Hamel's testimony regarding *896 these activities was not specific to the 12.62 acre tract. The testimony fails to establish actual possession for the requisite period by Hamel's Farm of the part of Lot G that is dry land. In support of its decision, the trial court also pointed out that Dr. Muslow did not know that part of the property he purchased in 1976 extended to dry land. However, the Muslows' possession of any part of the property they purchased gives them constructive possession to the extent of their title. Because Hamel's Farm failed to prove inch by inch possession or possession within enclosures of that part of Lot G that is on dry land, we must reverse the trial court's judgment declaring Hamel's Farm owner of that part of the disputed property.

CONCLUSION
Having reviewed the record in its entirety, we find that the Muslows are the owners of the disputed 12.62 acres by valid record title, and that Hamel's Farm has failed to prove ownership of any part of the property by acquisitive prescription. The trial court's judgment declaring Hamel's Farm the owner of that portion of what was formerly Lot G of Dixie Gardens Subdivision, No 2, that does not constitute the lake bed is reversed, and the judgment is otherwise affirmed. Costs of the appeal are assessed against Hamel's Farm.
REVERSED IN PART AND AFFIRMED.
APPLICATION FOR REHEARING
Before WILLIAMS, STEWART, DREW, MOORE and LOLLEY, JJ.
Rehearing denied.
MOORE, J., would grant rehearing to affirm trial court in its entirety.
NOTES
[1] The disputed property is located in Sections 15 and 16 of Township 17 North, Range 13 West.
[2] Dr. Joiner defined an avulsion as an "overnight cataclysmic change in the river course resulting in remnant water and more particularly a change in course." He testified that an avulsion can be manmade, such as the Shreve Island Cutoff, or natural as occurred in May 1930.

An avulsion is also "a violent action of the water of a river that detaches an identifiable part of riparian land and attaches it to other lands on the same or the opposite bank." La. Civ. L. Treatise, Property § 76 (4th Ed.). This action does not result in the ownership of the riparian land being lost as long as the owner reclaims it under La. Civ. C. art. 502. Id.
[3] As pointed out in the Muslows' brief, neither the 1941 or 1957 deeds references the lots at issue; the 1941 does not reference any map, whereas the 1957 deed references a map by George Dutton dated December 8, 1941; there is a difference in the calls in the two deeds; the 1941 deed warrants only 2.56 acres; and the 1957 deed includes no warranty and purports to include accretions and additions to the land, though this was not mentioned in the 1941 deed. These observations further support the trial court's finding that Hamel's Farm's chain of title is ambiguous.
[4] Plaintiff's Exhibit O also supports our finding. It is a notarized document dated May 22, 1936, by the South Highlands Company, Inc., assigning its claim for damages against the Caddo Levee District to W. Russell Barrow and Broadmoor, Inc., who acquired property in Dixie Gardens from a sheriff's sale and who are ancestors-in-title in the Muslows' chain. The document states that property in Dixie Gardens was damaged by being thrown into the bed of the river by the moving back of the levee. Though the document refers to the bed of the river, nothing in the record shows that the property was actually part of the bed as defined by law.