Judgment rendered August 10, 2022.
Application for rehearing may be filed
within the delay allowed by Art. 2166,
La. C.C.P.

No. 54,678-CA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

HALL PONDEROSA, LLC                    Plaintiff-Appellant

versus

STATE OF LOUISIANA,                    Defendant-Appellees
THROUGH LOUISIANA STATE
LAND OFFICE; JOHN LAVIN,
DIRECTOR OF LOUISIANA
STATE LAND OFFICE

* * * * *

Appealed from the
Thirty-Ninth Judicial District Court for the
Parish of Red River, Louisiana
Trial Court No. 35585

Honorable Dee Hawthorne, Judge *(Ad Hoc)*
Honorable John Robinson, Judge *(Ad Hoc)*

* * * * *

BETHARD & BETHARD, L.L.P.              Counsel for Appellant
By: Benjamin T. Bethard
    Matthew S. Kelley

PETTIETTE, ARMAND, DUNKELMAN,
WOODLEY, BYRD & CROMWELL, L.L.P.
By: Edwin H. Byrd, III

JEFFREY M. LANDRY                      Counsel for Appellees,
Louisiana Attorney General             State of Louisiana,
                                       through Louisiana State
                                       Land Office; John Lavin,
RYAN M. SEIDEMANN                      Director of the Louisiana
CHRISTOPHER J. LENTO                   State Land Office; and
Assistant Attorneys General            State of Louisiana
                                       Mineral and Energy
                                       Board

DAVIDSON SUMMERS, A.P.L.C.          Counsel for Appellee,
By: J. Davis Powell                Stephens Sisters, L.L.C.

THE PARKS FIRM, L.L.C.             Counsel for Appellees,
By: Santi A. Parks                 Elizabeth Fisher Lester
                                   Minerals, L.L.C.; and
                                   Elizabeth Fisher Lester
                                   Land, L.L.C.

NICKELSON LAW P.L.L.C.             Counsel for Appellee,
By: John C. Nickelson              Random Precision, L.L.C.

RANDAZZO, GIGLIO & BAILEY, L.L.C.  Counsel for Appellee,
By: Joseph Charles Giglio, III     Vine Oil & Gas, L.P.

* * * * *

Before MOORE, COX, and MARCOTTE, JJ.

**COX, J.**

This suit arises out of the 39th Judicial District Court, Red River Parish, Louisiana, *ad hoc* Judges Dee Hawthorne and John Robinson presiding. Hall Ponderosa, LLC ("Hall") brought suit against the State of Louisiana to be declared the owner of certain land and minerals along the Red River. The trial court found against Hall, and Hall now appeals. For the following reasons, we reverse the trial court's judgment regarding expert fees and remand for a contradictory hearing to determine the amount of expert fees. We affirm the trial court in all other respects.

## FACTS

Hall owns title to property that was adjacent to the Red River prior to 1945 and located in Sections 13 and 14, Township 12 North, Range 10 West, in Red River Parish, Louisiana. The property in dispute is located west of the current path of the Red River and east of the former river channel (referred to as "the Island") and includes a portion of the former river channel (referred to as "the Oxbow").

Hall filed a petition for declaratory relief on April 30, 2012, seeking to prevent the State from claiming lands located above the ordinary low water line of the Red River adjacent to and within the disputed property. Through a series of amended petitions, the following parties were named defendants: the Louisiana State Mineral and Energy Board ("State"), Stephens Sisters, LLC ("Stephens Sisters"), Elizabeth Fisher Lester Minerals, LLC ("Lester Minerals"), Elizabeth Fisher Lester Land, LLC ("Lester Land"), Elizabeth Claire Lester Bausch, Leu Anne Lester Greco, and Random Precision, LLC. Hall's amended petitions sought judgment denying any of the defendants'

claims to the property above the ordinary high water line and any alluvion or accretion.[1]

Hall's predecessor in title was W.A. Hall, who acquired property known as the Stella Plantation in 1926 ("the 1926 property"). Hall's position was (and still is) that in 1945, the Red River made an avulsion cut north of its property, which caused the Red River to meander away from the 1926 property and create a large deposit of alluvion. W.A. Hall then acquired additional adjacent property from the Town of Coushatta in 1952 ("the 1952 property"). Hall claimed that the Red River slowly migrated south adding a significant amount of accretion to the southern portion of Hall's property. In 1975, the Red River Waterway Commission ("RRWC") obtained a servitude from Hall to cut a dredge across the property in order to redirect the channel of the Red River. A dam was constructed to divert the flow of the Red River down the new channel. Hall claims that the old riverbed (the Oxbow) became nonnavigable and W.A. Hall's ownership then extended to the middle of the Oxbow. Because of a series of locks and dams being constructed, the majority of Hall's claimed property lies underwater.

Hall claimed that this permanent flooding by the locks and dams did not change the ownership of the riverbank. It asserted that the State was claiming property lying above the ordinary low water mark of 102 feet. It also claimed that it owned the accretion because it belongs to the owner of the riverbank. Hall sought monetary damages for any mineral royalties or lease bonuses paid to the State on property owned by Hall.

_____

[1] Alluvion and accretion are used interchangeably throughout this opinion, as it was used by the parties.

Lester Land and Lester Minerals filed an answer and reconventional demand denying Hall's allegations. They claimed that their title included an undivided interest in part of the property that Hall claimed to own. They asserted that Dr. Frank Willis's expert report evidences their title ownership. They stated that, subject to any acquisitive prescription claim by Stephens Sisters and the fixing of the State's property line, their own title and ownership interest is superior to any other ownership claim.

Stephens Sisters filed an answer, reconventional demand, and crossclaims alleging that Hall unlawfully entered upon and traversed its property, resulting in physical damage, mental anguish, and embarrassment. It added the defenses of acquisitive prescription, its title of record, and any interest it may have by way of riparian movement, including accretion, dereliction, avulsion, or alluvial deposits. It asserted that it owned all accretion and alluvial deposits attached to its titled property. It claimed that it has possessed the property at issue in excess of the required ten or thirty years for acquisitive prescription. Stephens Sisters also claimed any land claimed by the State that was above the ordinary high water mark. Stephens Sisters requested all damages to which they may be entitled. Ms. Greco, Random Precision, Lester Minerals, and Lester Land answered individually and claimed any interest they had by way of right of title, riparian movement, and acquisitive prescription.

The State filed its answer, reconventional demand, and crossclaims. The State denied that the Red River meandered away from the 1926 property and created a large alluvion deposit owned by Hall. It alleged that the Red River abandoned its bed and opened a new one. It stated that the property W.A. Hall purchased from the Town of Coushatta was not as large as Hall

3

depicted. The State claimed that the new channel cut via the RRWC servitude was dredged only over a portion of Hall's property and not the large area claimed by Hall. It denied that much of Hall's property lies underwater after the dam was constructed.

The State claimed ownership of the land that is part of the beds and bottoms of the Red River. It therefore asserted that Hall has suffered no monetary damages for which the State is liable. It also claimed that Hall's surveyor improperly extended section lines to fit his conclusions as to the extent of Hall's property. The State argued that once the Red River made its avulsive cut across the peninsula, abandoned its bed, and opened a new bed, the southern extent of the 1926 property was fixed along the former left descending bank of the river. Therefore, according to La. C.C. art. 504, the owner of the land on which the Red River opened its new bed took the abandoned bed, up to the former left descending bank, which bordered the 1926 property. It claimed that after the 1945 avulsion, the 1926 property was no longer riparian. It argued that because the Red River moved, the "stream of the Red River" referred to in the legal description from the Town of Coushatta to W.A. Hall is actually the *former* stream of the Red River. It claimed this interpretation is necessary given the river's movement and description of the property as a "strip" of land.

The State requested that it be declared owner of the current and former bed and bottom of the Red River (as relating to this litigation) and that Hall's property be limited to the 1926 property, any alluvion prior to the 1945 avulsion, and the property from the Town of Coushatta limited to the boundary of the old riverbed. It also requested Hall be taxed with all costs and it be awarded all relief, including expert fees.

4

Hall and the State agreed that Hall could not assert any acquisitive prescription claims against the State. Preliminary default judgments were entered against Ms. Bausch and Ms. Greco, and they did not appear at or participate in the trial.

The bench trial was held from February 20 through March 3, 2018. Hall called Thomas Wright, manager of Hall Ponderosa, to testify. Mr. Wright testified that his grandfather, W.A. Hall, purchased the property that is now owned by Hall Ponderosa. He testified regarding the title of the property; hunting on the Island prior to the cutting of the new channel; visiting the property six to ten times per year growing up; oil and gas leases signed by Hall on the property in 1990 and 2008; and a servitude agreement between Hall and RRWC to dredge a channel through the middle of their property. He stated that after the navigation channel was cut, there was no agricultural activity on the Island and he was unsure of any hunting activity. He also testified on cross-examination that from the time the new channel was cut until around 2008, he accessed the Island once in 1993.

Mr. Wright stated that they had the property surveyed by Michael Mayeux and that survey was completed in April 2009. He testified that he met with Mrs. Antionette Stephens McVea, who was part of Stephens Sisters, to discuss the survey and she did not oppose or disagree with the survey at that time. Mr. Wright stated that he continued to access the Island via the Stephens Sisters' property throughout 2009 with Mrs. McVea's permission and posted "No Trespassing" signs on the Island. He stated that in 2010 or 2011, Mrs. McVea stated he could no longer access the Island through Stephens Sisters' property but he continued to access the Island.

5

Hall called its first expert, Michael Mayeux. Mr. Mayeux testified as an expert in the field of surveying. He testified that when surveying the Hall property, he reviewed deeds, plats, maps, aerial photos, surveys and reports regarding the Red River, and previous court cases concerning the movement of the river. Mr. Mayeux demonstrated the movement of the relevant portion of the Red River through aerial photos, surveys, and maps. His testimony revealed that there was some movement of the river prior to 1945, but it was not significant. However, a photo from 1946 showed the avulsion that occurred, and in his opinion, that avulsion created alluvion that attached to the Hall property and continued to grow. Mr. Mayeux testified that he did not believe two avulsions occurred because his research did not reveal two channels existed at the same time. He stated this was significant because when an avulsive act occurs, it reaches across the former channel, so there are two channels that exist at the same time.

On cross-examination, Mr. Mayeux stated that he drew a unit map for Petrohawk covering the disputed property. He admitted to using the same property lines from his survey when he was hired by Hall. Mr. Mayeux also admitted to some description errors in his report. He testified that if Dr. Willis is correct that a second avulsion occurred, the results of his survey would change. He agreed that if the second avulsion occurred, the Town of Coushatta would not have been able to convey as much property as the survey shows because the portion of the former riverbed would have been an indemnification to the landowner of the new riverbed.

Hall's second expert to testify was Joseph Castille. Dr. Castille was accepted by the court as an expert geographer. He testified that based on aerial photos and walking through the area, nothing alerted to a second

6

avulsion. He stated that if there had been a second avulsion, he would expect to see an island between the two avulsions. Dr. Castille testified that when he was on the property in 2009, he did not see evidence of anyone possessing the Island, fences, roads, or deer stands. On cross-examination, he stated that he was not initially hired to give an opinion regarding the second avulsion but was later asked his opinion on the subject. He testified that he relied on Mr. Mayeux's work. He also admitted that there could have been a low island between the first avulsion and alleged second avulsion because the picture he looked at was taken at a time of high water.

Hall's third and final expert to testify was George Kemp. Dr. Kemp testified as an expert in geomorphology and hydrology. He stated that he was retained to look into the nature of the meandering and avulsion changes in the relevant portion of the Red River "from a physical process standpoint, sediment transport." He testified that it was his opinion that there was one avulsion and then "a lot of downstream adjustment to the avulsion through rapid meanders." Dr. Kemp stated that the two channels never existed at the same time so there could not have been two avulsions. On cross-examination, he agreed that an avulsion is fast movement and accretion is slow movement. He stated that what Dr. Willis calls a second avulsion, he calls a rapid downstream meander adjustment. He highlighted that it was rapid, but not as quick as an avulsion.

Next to testify on behalf of Hall was Donald "Luke" Pearson, a land and right of way manager for the RRWC. He stated his job entails leasing and other legal issues regarding land and real estate. He stated that the 1972 servitude paperwork provided that W.A. Hall owned the Island, 3,083 feet of river frontage out of 6,375 feet total, and 94.4 acres. He stated there was no

7

mention of any Lester family ownership in his paperwork. Mr. Pearson testified that the servitude covered the entire Island until a settlement agreement was reached with Hall in 2014 to release all of the servitude except a portion of the riverbank for maintenance. On cross-examination, he admitted that the RRWC servitude reports do not show property lines between land owners within the same RRWC designated tract. He stated Hall was included in what the RRWC called "Tract 5" as owning an undivided interest.

Kenneth Wright testified that he is W.A. Hall's grandson and an attorney. He stated that he frequented the property growing up and his grandfather farmed the property. He stated that since his grandfather died in 1967, he has been to the property every decade. Gregory Hall testified that he is also the grandson of W.A. Hall. Gregory is a petroleum engineer in Oklahoma. He testified that he would hunt, shoot guns, and pick peas on the property. He stated that after the dredging of the current river channel in the 1970s, he still visited the property but primarily on the east bank of the river. He stated that when he drove on the Red River bridge in Coushatta, he would look out at the Island and never saw signs of someone else being on the Island.

The State called Dr. Frank Willis to testify as an expert in civil engineering, hydrology, land surveying, aerial photogrammetry, and geoscience. He stated that if there was no second avulsion, the river would have had to turn at a 40-degree angle, which is not possible given the size of the Red River. He also testified that the river would have been flowing through sand and the sand could not have held the river at that angle. Dr. Willis stated that the Island looks like accretion at first glance, but once you

8

know the process, you know it cannot be accretion. He stated that the Island is actually alluvion soil and cottonwood and willow trees will grow and take over in alluvion soil, which is what happened on the Island. He stated that the trees follow the flow of the river so just follow the tree line to see where the river once was. Dr. Willis disagreed with Dr. Kemp's position that there was rapid meandering. He stated that rapid meandering is usually normal in these instances of an avulsion further upstream, but here it could not be rapid meandering because of the sharp turn the river was required to make.

Dr. Willis pointed out problems and flaws he noticed in Mr. Mayeux's report, upon which Dr. Castille relied. He stated that Mr. Mayeux and Dr. Castille did not follow all required land surveyor rules when investigating the property. On cross-examination, he was asked about the 1950s Hyam Survey that did not show two avulsions. He stated that he did not agree with the survey as far as it concerned the second avulsion, but he pointed out language on the survey suggesting an old riverbed in the area of the second avulsion.

Stephens Sisters called Mark Tooke to testify as an expert in professional land and boundary surveying. He stated that he reviewed the Mayeux and Willis surveys. He testified that his work did not involve the 1945 avulsions but only the Oxbow, which is west of the Island. He stated that the lowest points of elevation are good indications of the location of the deepest channels. He stated that after reviewing the reports, he agreed with Dr. Willis's survey regarding the Oxbow as the old river channel.

Paul Lambert testified that he is married to Susan Stephens Lambert, who is part of Stephens Sisters. He testified that he and the family accessed the Island via adjacent Stephens Sisters' property since the current

9

navigation channel was cut.  He stated that he and others have been involved in hunting, planting food plots, fishing, building access roads, and riding three wheelers and four wheelers about eight to ten times per year and around the holidays.  Mr. Lambert testified that he never saw anyone from the Hall family on the Island.  He stated that he went with his sister-in-law, Mrs. McVea, to meet with Mr. Mayeux.  He testified that he never granted members of the Hall family any access to the Island.

Mrs. Lambert testified regarding the chain of title to the Stephens Sisters' property.  She stated that her husband, family, and employees have accessed the Island since the current river channel was dredged.  She testified that she has not seen anyone from the Hall family on the property, has never granted property access to anyone in the Hall family, and has never made a boundary agreement with anyone in the Hall family.

Thomas McVea, Sr. testified that he is married to Antionette Stephens McVea.  His testimony was the same as Mr. Lambert's testimony regarding the family activity on the Island and access to the Island.  Mrs. McVea testified and corroborated the testimony of her sister and brother-in-law. She stated that the only permission she gave to the Hall family was permission to access their property for a survey, but she thought the survey would be on the east side of the River, not the Island.  She testified that on multiple occasions their gate locks were cut and the fence was pulled away from the gate; it was later determined and admitted by Hall that Hall was responsible for the damage.  She stated that she personally saw the "No Trespassing" signs placed by and on behalf of Hall and was upset over the signs.  On cross-examination, she stated that the Island was never

specifically listed in any Stephens Sisters' mineral leases, but the leases included accretions, sand bars, etc.

John Contois, Jr. testified that he is a member of the Stephens Sisters family because his mother is Rebecca Stephens Christian. He stated that he has fished, trapped, and hunted on the Island. He testified that he visits the property three to four times per year and has never seen anyone from the Hall family on the property.

John Lester, III testified that he has an access agreement with Stephens Sisters to access the property adjacent to the Island. He testified that it has been common knowledge since the new channel was dredged that Stephens Sisters possessed the Island and the Stephens family are the ones he has seen on the Island. He stated that he had permission from Stephens Sisters to access the Island and rode horses and ATVs on the Island. He stated that the only access to the Island by land is on the west side, first through his property and then through adjacent Stephens Sisters property. He testified that he did open the Stephens Sisters' gate for the Hall survey to be completed but later denied them access.

The parties recalled their experts for rebuttal and submitted post-trial briefs. On October 6, 2020, the trial court signed its ruling and reasons for ruling. The trial court highlighted that this is a complex case. The trial court found the State's and Stephens Sisters' arguments, evidence, and experts to be persuasive. The trial court found the expert testimony to largely resolve this case. The trial court found that Mr. Mayeux seemed unable to contain his testimony to his own area of expertise and conflicts of interest were pointed out, which caused concern. The trial court found it concerning that Dr. Kemp was willing to change his expert report at the direction of one of

11

the attorneys and did not find his testimony persuasive. The trial court did not have concerns with Dr. Castille's testimony but found that it did nothing to cause the court to question the testimony and opinion of Dr. Willis. The trial court found that the cumulative effect of Dr. Willis's multiple areas of expertise was of greater value than the sum of the discrete areas. It stated that he spoke frankly and clearly explained his opinions. It found that Dr. Willis did not hesitate to share or admit to any possible weaknesses in various positions. The trial court accepted his theories and explanations because he was drawing upon knowledge from his many areas of expertise.

Regarding the property dispute, the trial court found that the Red River abandoned its bed in 1945 as a result of two avulsions. Therefore, the 1926 property was no longer riparian and no further growth through accretion could have occurred. The trial court agreed with the State's position that the description of the 1952 property referenced the former stream of the Red River before the avulsions occurred. Because the 1952 property had not been riparian since 1945, it could not have increased by accretion.

The trial court also found from the testimony of members of Stephens Sisters, as well as relatives, and at least one adverse party, it was commonly known and accepted in the community that Stephens Sisters owned the Island. The trial court found that Stephens Sisters openly and continuously possessed the Island as owner and by way of the requisite physical acts of use, detention, or enjoyment. It stated that Hall began entering the property without permission after Stephens Sisters' possession by 30 years acquisitive prescription had been perfected; therefore, it found Stephens Sisters had a right to general damages in the amount of $15,000 for trespass.

The trial court adopted the opinions of Dr. Willis and Mr. Tooke that the last remnant channel and low water mark were located on the left descending bank of the Oxbow, which is below and adjacent to Stephens Sisters' land. The trial court found that the State of Louisiana did not own any land subject to this litigation that is above the ordinary low water line of the Red River. It found that Lester Land, Lester Minerals, and Random Precision own any land to which they hold title, less and except the land adjudicated to Stephens Sisters. All other theories or arguments were either moot or rejected by the court. Hall was assessed with all costs, but attorney fees were not awarded. The trial court signed the final judgment on December 10, 2020.

Hall filed a motion to recuse Judge Hawthorne, which was denied. Hall then filed a motion for new trial. After rendering final judgment, Judge Hawthorne relocated and asked to be removed from the case. The State filed a motion to tax its expert's fees as costs to Hall. The Supreme Court appointed Judge John Robinson as *ad hoc* over the remaining matters. The trial court then denied Hall's motion for new trial and granted the State's motion to tax costs to Hall in the amount of $46,266.66. Hall now appeals.

## DISCUSSION

*Accretion or Second Avulsion*

Hall argues that the land at issue is accretion and not the result of a second avulsion. Hall states this Court addressed this avulsion and its effect on adjacent property in *Stephens v. Drake*, 134 So. 2d 674 (La. App. 2 Cir. 1962). It asserts that in that case, there was no second avulsion, but an accretion. It highlights that the Hyams survey, 1950 aerial photograph, and Louisiana Public Works right-of-way map all support its contention that the

13

property is an avulsion. It argues that the trial court erred in ignoring this evidence and accepting the opinion of Dr. Willis, who did not produce any positive evidence that a second avulsion occurred. Hall contends that the trial court's finding of a second avulsion should be reversed.

The State argues that this Court should not disturb "such a complicated analysis" by the trial court. The State notes that its expert, Dr. Willis, was accepted as an expert in civil engineering, hydrology, land surveying, aerial photogrammetry, and geoscience. The State highlights Dr. Willis's testimony regarding the second avulsion of the Red River. Dr. Willis used several exhibits to demonstrate how and why the second avulsion occurred, and his photogrammetric evidence was not refuted by Hall's experts. The State argues that the trial court was correct in finding that Dr. Willis's conclusion was reasonable.

The central issue involved in this case is the movement of the Red River in 1945.

Accretion formed successively and imperceptibly on the bank of a river or stream, whether navigable or not, is called alluvion. The alluvion belongs to the owner of the bank, who is bound to leave public that portion of the bank which is required for the public use. La. C.C. art. 499.

Avulsion is not defined in our Civil Code. According to the Romanist tradition, avulsion is a violent action of the water of a river that detaches an identifiable part of riparian land and attaches it to other lands on the same or the opposite bank. 2 La. Civ. L. Treatise, Property § 4:15 (5th ed.). In *Hamel's Farm, L.L.C. v. Muslow*, 43,475 (La. App. 2 Cir. 8/13/2008), 988 So. 2d 882, *writ denied*, 2008-2431 (La. 1/30/2009), 999 So. 2d 754, an

expert defined an avulsion as an "overnight cataclysmic change in the river course resulting in remnant water and more particularly a change in course."

When a navigable river or stream abandons its bed and opens a new one, the owners of the land on which the new bed is located shall take by way of indemnification the abandoned bed, each in proportion to the quantity of land that he lost. La. C.C. art. 504.

The determination of whether the river movement was an avulsion or accretion is a finding of fact. To reverse a fact-finder's determination under the manifest error standard, an appellate court must engage in a two part-inquiry: (1) the court must find from the record that a reasonable factual basis does not exist for the finding of the trier of fact, and (2) the court must further determine that the record establishes a finding that is clearly wrong. *Beals v. New Fellowship Missionary Baptist Church of Delhi, Inc.*, 51,868 (La. App. 2 Cir. 2/28/2018), 246 So. 3d 701. When there are two permissible views of the evidence, the trial court's choice between them cannot be manifestly erroneous or clearly wrong. *Stobart v. State through DOTD*, 617 So. 2d 880 (La. 1993); *Hamel's Farm, L.L.C. v. Muslow, supra*.

The rule that questions of credibility are for the trier of fact extends to the evaluation of expert testimony, unless the reasons stated by the expert are patently unsound. *Lewis on Behalf of Lewis v. Cornerstone Hosp. of Bossier City, LLC*, 53,056 (La. App. 2 Cir. 9/25/2019), 280 So. 3d 1262. The effect and weight to be given to expert testimony depends on the underlying facts and rests within the broad discretion of the trial court. After weighing and evaluating expert and lay testimony in a bench trial, the trial court may accept or reject the opinion expressed by any expert. *Scott v.*

15

*State Farm Fire & Cas. Co.*, 47,490 (La. App. 2 Cir. 9/26/2012), 106 So. 3d 607.

Hall called the following three expert witnesses regarding the river's movement: Mr. Mayeux, Dr. Kemp, and Dr. Castille. The State called one expert, Dr. Willis. The trial court stated in written reasons that in large part, the resolution of the case relied upon the testimony of experts. It is evident from the transcript and written reasons that the trial court paid close attention to the experts' testimonies and exhibits. The trial court relied heavily on Dr. Willis's testimony regarding the second avulsion. Faced with differing expert opinions, the trial court gave well-reasoned explanations for its preference toward the testimony of Dr. Willis, namely his wide range of expertise.

Dr. Willis has an extensive educational background and was accepted as an expert in five areas. In contrast, Hall's three experts testified in a combined four areas of expertise. The trial court noted the following regarding Hall's experts: Mr. Mayeux's conflicts of interest were cause for caution and he did not have the advantage of possessing multiple areas of expertise; Dr. Kemp's testimony was not persuasive and there was cause for concern regarding his willingness to change his expert report at the direction of one of the attorneys; and, Dr. Castille's testimony did nothing to cause the court to question the testimony and opinion of Dr. Willis. Regarding Dr. Willis, the trial court stated:

> The Court finds that the cumulative value of Dr. Willis's multiple areas of expertise is greater than the sum of the discrete areas; thus, a synergistic effect is achieved, which is of great value to the Court. Dr. Willis testified frankly and was able to explain clearly his testimony and opinions. He did not hesitate to share or admit any possible weaknesses he felt existed in the data or various positions. The Court accepts his

theories and explanations, as it was clear that he was drawing upon knowledge from his many areas of expertise.

Dr. Willis testified that two avulsions occurred; he marked the first one in blue and the second in red on State's exhibit 9, a portion of which is scaled down and shown below:



Dr. Willis testified that prior to 1945, the Red River made a hairpin bend, which was probably as tight as it could have turned considering the soil in the area. He stated that during the flood of 1945, the river jumped the left descending bank, made an avulsive cut across the peninsula, and "roared" across the peninsula in its new riverbed. He testified that because of the momentum going through the first new cut, the river would not have been able to turn after the first avulsion and stay in its existing bank. He stated that although rapid meandering could occur after the first avulsion, the river was "past the point of no return." Dr. Willis testified that if the second avulsion had not occurred, the river would have had to make a sudden turn to the northeast to remain in the river bed. He stated that the only way it

could have done that is if it hit rock or some type of formation, but there is no formation there.  He therefore concluded that the second avulsion occurred south of the first avulsion.

The issue of a second avulsion and its effects were not an issue in *Stephens v. Drake, supra*.  The property in *Stephens v. Drake, supra,* did not involve the same property that is disputed in the instant case, although it did involve nearby property and the 1945 Red River flood.  In that case, the court found that when the Red River changed its course, Stephens did not lose title to the peninsula by reason of its separation from their adjacent property.  When the river cut a new channel through Stephens' property, they gained title to the old river bed.  The court also found that "the evidence fails to disclose the existence of any accretion or alluvion attached to defendant's property[.]"

The effect of *Stephens v. Drake, supra,* on this case is to reinforce the undisputed fact that an avulsion occurred in 1945 when the Red River changed its course.  It also reinforces La. C.C. art. 504, which provides that when a river abandons its bed and opens a new one, the owners of the land on which the new bed is located shall take by way of indemnification the abandoned bed.

After reviewing the evidence in its entirety, we find that the trial court's conclusion was a reasonable one.  The trial court clearly found Dr. Willis to be more persuasive due to his superior credentials and ability to articulate and explain the complex river movement.  The trial court did not commit manifest error, nor was it clearly wrong in accepting the testimony of Dr. Willis, rejecting the testimony of Hall's experts, and determining a second avulsion occurred.  This assignment of error lacks merit.

*Acquisitive Prescription*

Hall's second, third, and fourth assignments of error involve possession and acquisitive prescription. Because possession is essential to a claim of acquisitive prescription, we will discuss these assignments of error together.

Hall argues the trial court erred in failing to find that it acquired title to the property by way of 10- or 30-year acquisitive prescription and precariously possessed the entire property through the RRWC servitude. Hall states that it is uncontroverted that it acquired a portion of the property in 1926, the remaining property in 1952, and possessed all of the property until the Army Corps of Engineers dredged through the land to create a new channel in 1973. It argues that by referencing the property as an Island that they never accessed, the trial court erred in failing to consider the servitude.

Hall asserts that the servitude did not legally divide the property into two separate tracts, but it is one tract with a river running through it; therefore, according to La. CC art. 3426, by possessing a portion of the property, it possesses all of it. It also asserts that the RRWC has acted as a precarious possessor on its behalf. It states that it has paid property taxes and granted mineral leases on the property. For these reasons, it requests the trial court be reversed on the issues of acquisitive prescription and precarious possession.

Hall argues the trial court erred in finding that the Stephens Sisters perfected its claim of 30-year acquisitive prescription. It highlights that the trial court made no mention of the nature of the possession it found to be adequate. It asserts that Stephens Sisters could not have possessed the property for 30 years because it was founded in 2006. It argues that

19

Stephens Sisters cannot tack on a predecessor's right to possession because it did not obtain the property through universal title, but through particular title which does not include a reference to the land at issue.

Stephens Sisters addresses Hall's 30-year acquisitive prescription argument only to state that if Hall could prevail in this argument, it does not impair or otherwise affect the trial court's determination that the Stephens family later established ownership through acquisitive prescription. It argues that a close look at the record reveals that any activity by the Hall family was limited to title land, rather than the additional land sought in this lawsuit, i.e. the Island and Oxbow.

Stephens Sisters addresses Hall's argument regarding its time in existence and ability to tack possession. It asserts that possession of lands beyond an owner's title for 30 years within visible bounds may be transferred between possessors. It claims that the title and description of their property, which is adjacent to the disputed property, includes all accretions, batture, and sand bars attached to and forming part of those lands. It argues that the trial testimony evidences that the Stephens family, including the Stephens Sisters' members, have had activity on the Island since the time of their father's ownership.

The party asserting acquisitive prescription bears the burden of proving all the facts that are essential to support it, including possession for the requisite years. *EOG Res., Inc. v. Hopkins*, 48,577 (La. App. 2 Cir. 11/27/2013), 131 So. 3d 72, *writs denied*, 2013-2861, 2013-3015 (La. 3/14/2014), 134 So. 3d 1196. Whether a party has possessed the disputed property for 30 years without interruption is a factual issue that will not be reversed on appeal absent manifest error or a showing of an abuse of

20

discretion. *Beals v. New Fellowship Missionary Baptist Church of Delhi, Inc., supra.*

To acquire possession, one must intend to possess as owner and must take corporeal possession of the thing. La. C.C. art. 3424. Corporeal possession is the exercise of physical acts of use, detention, or enjoyment over a thing. La. C.C. art. 3425. One who possesses a part of an immovable by virtue of a title is deemed to have constructive possession within the limits of his title. In the absence of title, one has possession only of the area he actually possesses. La. C.C. art. 3426. Actual possession must be either inch by inch possession (*pedis possessio*) or possession within enclosures. According to well-settled Louisiana jurisprudence, an enclosure is any natural or artificial boundary. La. C.C. art. 3426, comment (d). The party who does not hold title to the disputed tract has the burden of proving actual possession within enclosures sufficient to establish the limits of possession with certainty, by either natural or artificial marks, giving notice to the world of the extent of possession exercised. *Brunson v. Hemler*, 43,347 (La. App. 2 Cir. 8/13/2008), 989 So. 2d 246, *writ denied*, 2008-2297 (La. 12/12/2008), 996 So. 2d 1119.

Acquisitive prescription is a mode of acquiring ownership or other real rights by possession for a period of time. La. C.C. art. 3446. The requisites for the acquisitive prescription of ten years are: possession of ten years, good faith, just title, and a thing susceptible of acquisition by prescription. La. C.C. art. 3475. Ownership and other real rights in immovables may be acquired by the prescription of thirty years without the need of just title or possession in good faith. La. C.C. art. 3486. For

21

purposes of acquisitive prescription without title, possession extends only to that which has been actually possessed. La. C.C. art. 3487.

Under La. C.C. art. 794, one may utilize tacking to prescribe beyond title on adjacent property to the extent of visible boundaries, but under the general prescriptive articles, La. C.C. arts. 3441 and 3442, tacking may be utilized to prescribe only to the extent of title. *Loutre Land & Timber Co. v. Roberts*, 2010-2327 (La. 5/10/2011), 63 So. 3d 120.

We note that the Island property has water for visible boundaries and is adjacent to other property owned by Stephens Sisters. As discussed in detail in *Loutre Land & Timber Co. v. Roberts, supra*, La. C.C. art. 794 allows Stephens Sisters to tack their possession to that of their ancestors in title under these circumstances.

In determining possession, the trial court stated that the pertinent time period was from 1976 to 2010. The trial court did not outline the acts of possession by the Stephens family but stated there was convincing testimony from members of Stephens Sisters, friends, relatives, employees, and at least one adverse party. The trial court found that Stephens Sisters openly and continuously possessed the Island as owner and by way of the requisite physical acts of use, detention, or enjoyment in accordance with the nature of the property. We find no manifest error in this conclusion.

Mr. Lester, manager of Random Precision and an adverse claimant, testified that he accessed the Island with permission from Stephens Sisters. He stated that it is common knowledge in the community that Stephens Sisters owned the Island and the only people he saw on the Island were from the Stephens family. Mr. and Mrs. Lambert and Mr. and Mrs. McVea had similar testimony that their family, friends, and employees accessed the

Island via their adjacent property. They testified that they used the property for recreation, hunting, and fishing. Testimony also revealed that they built access roads and planted food plots.

Thomas Wright testified that after the navigational channel was cut, the Hall family did not plant on the Island and he was unsure of any hunting on the Island. He stated that he did walk the Island around 1993. Kenneth Wright testified that he had been on the property every decade since the 1960s. Gregory Hall testified that since the channel was dredged, he has visited the property, but primarily on the East bank.

The trial court has great discretion in evaluating witness credibility. It is in the best position to judge the tone and demeanor of the witnesses. The trial court found that since the channel was dredged, the Stephens Sisters' possession was essentially unchallenged. The trial court stated that Thomas Wright's testimony was effectively impeached because he first stated he had not been on the Island since the navigational channel was cut, but stated on cross-examination that he changed his mind and had been on the Island in 1993.

The testimony at trial supports the trial court's conclusion that Stephens Sisters had uninterrupted possession of the Island since 1976. The trial court was in the best position to judge the credibility of the witnesses. We do not find error in the trial court's ruling on acquisitive prescription. These assignments of error lack merit.

*Boundaries within the Oxbow*

Hall argues the trial court erred in locating the boundary between its property and the State's property in the Oxbow. It claims that its survey particularly describes the boundary, as required by law. Hall asserts that the

State was allowed to introduce "admittedly bad data" that was misleading and set the boundary further east than its survey. Hall argues that had the State's expert extended data further to the west, it would have picked up the correct remnant channel and placed the boundary in the proper place.

Stephens Sisters argues that the trial record supports the ruling and judgment regarding the last remnant channel and boundaries within the Oxbow. It asserts that even if Hall's expert is credible on the issue, it is competing testimony with its expert and the State's expert. It points out that the trial court relied on the likeminded testimony of the Defendants' experts.

The State argues that Mr. Mayeux placed the boundary line of Hall's supposed property too far west and the line actually lies to the east of where Mr. Mayeux placed it. The State asserts that Dr. Willis credibly demonstrated at trial that Mr. Mayeux's accretion theory was incorrect. It argues that this Court should not disturb such a complicated analysis by the trial court.

As stated above in the avulsion discussion, the trial court was faced with competing expert views regarding the river channels and movement. This testimony was essential to the determination of the last channel, and therefore, the boundary within the Oxbow. These factual findings and weighing of expert opinions are subject to the manifest error standard of review, which is discussed in detail above.

Hall's expert, Mr. Mayeux, placed the last remnant channel further to the west than Dr. Willis opined its location. Stephens Sisters retained Mr. Tooke as their expert for the limited purpose of comparing Mr. Mayeux's and Dr. Willis's opinions. Mr. Tooke compared the two opinions to aerial

24

photographs and determined that he substantially agreed with Dr. Willis's survey and location of the last remnant channel.

The trial court carefully considered the testimony and reports of these three experts. The trial court heard from three experts on this issue and two of the three agreed. The trial court found Dr. Willis to be more convincing, adopted his opinion, and attached his survey as part of its ruling. This is a finding of fact and choice between two differing opinions, in which the trial court has vast discretion. As stated above, the trial court gave more credence to Dr. Willis's testimony because of his vast credentials and ability to explain and demonstrate the movement of the river. We cannot say this was manifest error. As such, this assignment of error lacks merit.

*Expert Fees*

Hall argues the trial court erred in awarding the State $46,266.66 in expert witness fees because the State did not have their witness available for cross-examination about his fees and the bulk of its use of the expert was to pursue a claim that it had "no business pursuing."

The State asserts that the trial court properly awarded its expert witness fees and this Court should not overturn that action. It argues that based on the factors to determine whether expert fees should be awarded, the trial court was correct in awarding fees. The State reiterates the complexity of this case and the necessity of expert testimony to resolve the case.

La. R.S. 13:3666 provides the following, in pertinent part:

B. The court shall determine the amount of the fees of said expert witnesses which are to be taxed as costs to be paid by the party cast in judgment either:

(1) From the testimony of the expert relative to his time rendered and the cost of his services adduced upon the trial of

25

the cause, outside the presence of the jury, the court shall determine the amount thereof and include same.

(2) By rule to show cause brought by the party in whose favor a judgment is rendered against the party cast in judgment for the purpose of determining the amount of the expert fees to be paid by the party cast in judgment, which rule upon being made absolute by the trial court shall form a part of the final judgment in the cause.

If the order applied for by written motion is one to which the mover is not clearly entitled, or which requires supporting proof, the motion shall be served on and tried contradictorily with the adverse party. The rule to show cause is a contradictory motion. La. C.C.P. art. 963. If the rule seeks to value the total time employed by the expert, for example, time gathering facts necessary for his testimony, time spent away from regular duties while waiting to testify, or if the party seeks a fee outside of that normally charged by similar experts in that field, then the plaintiff in rule must prove by competent evidence, what service and expertise the expert rendered in addition to that observed by the trial court. *Wampold v. Fisher*, 2001-0808 (La. App. 1 Cir. 6/26/2002), 837 So. 2d 638. It has been the law for almost a century that the assertion of an attorney and the bill of an expert do not support an award for the total time of an expert. The expert must testify at the trial of the rule and be subject to cross-examination, unless there is some stipulation between the parties. *Wampold v. Fisher, supra, citing, Northwest Ins. Co. v. Borg-Warner Corp.*, 501 So. 2d 1063 (La. App. 2 Cir. 1987).

Final judgment in this case was signed in December 2020 by Judge Hawthorne, in which all costs were assessed to Hall. The State filed its motion to tax its expert fees as costs to Hall on January 26, 2021. Judge Robinson, who was appointed *ad hoc* after Judge Hawthorne's retirement, held a hearing on the State's motion to tax expert fees. Dr. Willis was not

26

present at the hearing for examination regarding his invoices and fees. Because the State seeks to have Hall cast with Dr. Willis's total bill and not limited to the time spent before the trial court, the jurisprudence of this State requires Dr. Willis to testify at the rule hearing and be subject to cross-examination. Therefore, we reverse the amount of the expert fee and remand to the trial court for a contradictory hearing on the amount of the expert fee.

*Property Description*

Hall argues the trial court erred in granting a final judgment that does not comply with Louisiana's requirements to particularly describe the immovable property and boundaries between landowners. Hall asserts that third parties will be unable to determine the boundary lines between the properties because the judgment description is too broad. Hall requests a new trial be granted on this basis.

Stephens Sisters argues that the trial court's ruling and judgment are explicit regarding the extent of the property and references boundaries of the property. It asserts that even if the judgment's description could be considered incomplete, it does not have to serve to nullify the judgment. It argues that at most, this Court should remand to reform the judgment as to the description in order to give full effect to the ruling.

All final judgments which affect title to immovable property shall describe the immovable property affected with particularity. La. C. C. P. art. 1919. The purpose of this article is "to insure that the public in general, and title examiners, successful litigants, officials charged with executions of judgments and surveyors in particular, can accurately deal with the immovable property." *Clark v. Fazekas*, 2019-1386 (La. App. 1 Cir.

27

5/11/2020), 303 So. 3d 1066. The judgment must include the legal description of a property, with reference to landmarks such as roads, benchmarks, or other monuments which can be located, or a survey commencing at some established point. *Id.*

The final judgment in this case includes the description of the 1926 property and the 1952 property. The judgment includes a reference to plaintiff's trial exhibit 1, which is a survey that is also filed in Red River Parish Conveyance Book 327, Page 5. A picture of this survey is also included on the judgment to show which property is described as the Island and which property is described as the Oxbow. The trial court describes the property at issue as:

> [T]he area west of the navigational channel (the current path of the Red River) and east of the former Red River channel (the "Island") and a good portion of the former Red River channel west of the Island. The former Red River channel was referred to at trial as the "Oxbow."

Finally, the judgment includes a reference to and incorporates plaintiff's trial exhibit 48 regarding the last remnant channel of the Red River in the Oxbow. The trial court states in the judgment that the center line of the channel is shown by the yellow line marked with points 126-128 and the low water line of the left descending bank is shown by the blue line marked with points 100-125. The trial court further ruled that the State owned no property above the low water line.

The survey, which is plaintiff's trial exhibit 48 and attached to the judgment as exhibit A, includes a point of beginning and coordinates of each point on the yellow and blue lines referenced by the trial court. It also states the sections, township, and range of the property depicted.

28

Our jurisprudence requires that the judgment include a legal description or survey. The case before us contains a legal description of the 1926 property and the 1952 property; a survey of the last remnant channel, which is a property line within the disputed property; and a picture and description of the Island. We find this legal description to be compliant with La. C. C. P. art. 1919. The public, litigants, and title examiners can read this judgment and the attached survey and accurately deal with the immovable property. This assignment of error lacks merit.

*Damages for Trespass*

Hall argues the Trial Court erred in assessing damages against it for trespass. It asserts that the reasons for ruling make no reference to where the dollar amount came from or how it was calculated. Hall claims that without any basis for actual damages, the award of $15,000 appears to be nothing more than punitive.

Stephens Sisters highlights that Hall does not seek to reverse the trial court's finding of trespass, only to reverse the damages award. It argues that one wronged by trespass is entitled to recover general damages, including damages for mental anguish, and the trial court is afforded much discretion. Stephens Sisters assert that Hall's actions in cutting its chains and locks were a clear act of trespass and subject to damages. It argues that it is clear from the record that the damages award was fully supported by evidence.

Trespass is defined as an unlawful physical invasion of the property or possession of another person. *Davis v. Culpepper*, 34,736 (La. App. 2 Cir. 7/11/2001), 794 So. 2d 68, *writ denied*, 2001-2573 (La. 12/14/2001), 804 So. 2d 646; *Sullivan v. Wallace*, 33,387 (La. App. 2 Cir. 8/23/2000), 766 So. 2d 654, *writ denied*, 2000-2647 (La. 11/17/2000), 774 So. 2d 978. A person

damaged by trespass is entitled to full indemnification. Where there is a legal right to recovery, but the damages cannot be assessed exactly, the court has reasonable discretion to assess the value based on all of the facts and circumstances of the case. *Davis v. Culpepper, supra.* Damages for dispossession of one's property are regarded as an award of compensatory damages for violation of a recognized property right and are not confined to proof of actual pecuniary loss. *Id.* One wronged by trespass is entitled to recover general damages, including damages for mental anguish. *Williams v. City of Baton Rouge*, 1998-1981, 1998-2024 (La. 4/13/1999), 731 So. 2d 240; *Davis v. Culpepper, supra.*

The trier of fact is given much discretion in the assessment of damages. Upon appellate review, damage awards will be disturbed only when there has been a clear abuse of that discretion. La. C.C. art. 2324.1; *Williams v. City of Baton Rouge, supra.*

The trial court awarded general damages in the amount of $15,000 to Stephens Sisters for the trespass of Hall on its property. Hall does not dispute the trespass, only the amount of damages. The trial court is given much discretion in the assessment of damages. Stephens Sisters suffered damaged fences and gates as well as mental anguish because of the acts of trespass. Mrs. McVea testified to the damages as well as her own mental and emotional anguish caused by the actual trespass, physical damages, and placement of "No Trespassing" signs. The trial court was in the best position to determine damage awards after listening to the testimony of the witnesses. We find the trial court did not abuse its discretion in assessing damages in the amount of $15,000.

**CONCLUSION**

For the reasons stated above, we reverse the trial court's judgment setting the State's expert fees and remand for further proceedings regarding the amount of the State's expert fees. We affirm the remainder of the trial court's judgment. Costs assessed with this appeal are cast on Hall.

**AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.**